IsCANNELLA, Judge.
Defendant, State of Louisiana, Department of Transportation and Development (DOTD) and plaintiffs, Roy Fayard (Fayard), and his mother, Marcia Fayard, appeal from two judgments in the case of a collision between a car and a pedestrian. We amend both judgments and affirm as amended.
On October 9, 1987 at approximately 9:20 p.m., pedestrian, Fayard, was injured when he was struck by a automobile driven by seminarian, Father Philip Landry. Fayard was returning home from the local Mc-Donalds where he made a telephone call to his mother, who was out of town. His home was located across from the restaurant and he was attempting to cross Jefferson Highway in the middle of the block near the Causeway-Jefferson intersection. A traffic signal light and crosswalk were located approximately 400 feet east of the accident site. 13Jefferson Highway is also U.S. Highway 90 and, under the control of the state, according to La.R.S. 48:191.
Fayard was 15 years old at the time of the accident. He was accompanied by a friend and business partner of his mother, Tuan Mina Le, with whom he was staying while his mother was out of town. The highway where the accident occurred is six lanes, three each traveling west and east. Fayard was struck as he was entering the middle lane of the eastward portion of the highway. As a result of the accident, Fayard suffered injuries to his legs.
On October 8,1988, suit was filed on behalf of Fayard and his mother, Marcia Fayard, against Philip Landry and his insurer, Government Employees Insurance Company, GEICO; the Parish of Jefferson (Parish) and DOTD. In September 1989, plaintiffs dismissed Philip Landry and GEICO.
On November 20, 1989, the Parish filed a Motion for Summary Judgment asserting that it had no responsibility for the design, ownership, construction, maintenance or repair of the roadway, lighting or crosswalk on Jefferson Highway. The Parish asserted that Jefferson Highway was owned by the DOTD. Fayard filed an opposition to the motion. However, the trial judge granted the motion in favor of the Parish on January 11, 1991.
On July 10, 1991, Charity Hospital intervened to recover $8,787.99 in medical costs provided to Fayard.
In June 1992, DOTD filed a Motion for New Trial of the Summary Judgment, claiming that it had no notice of the judgment and that DOTD had no responsibility for the roadway lighting factually and under La.R.S. 48:193. The trial judge denied the motion after a hearing and, for the second time, *1372 granted the summary judgment in favor of the Parish.
|4On July 18, 1993, DOTD filed a Motion for Partial Summary Judgment relative to the roadway lighting. No action was taken on the motion.
A judge trial on the merits took place on September 13, 14 and 15, 1993. The trial judge took the case under advisement and rendered judgment and written reasons in favor of Fayard for $250,000 and Marcia Fayard for $18,000. Fault was apportioned to Fayard of 50%, to Philip Landry of 30% and to DOTD of 20%. Fayard and his mother were then awarded $50,000 and $3,000 respectively. At a hearing on February 4, 1994, on Fayards’ Rule to Show Cause Why Costs Should Not Be Fixed, the trial judge also awarded Fayard the amount of the Charity Hospital intervention ($8,787.99) as costs. The judgment on said rule was signed on March 15, 1994. It is from the judgments dated December 16,1993 and March 15,' 1994 that DOTD and the Fayards now appeal.
In his reasons for judgment, the trial judge stated that he determined that DOTD was responsible for the lighting and the roadway, that the lighting was inadequate and that the inadequate lighting created an unreasonable risk of harm that was a cause of the accident. He also concluded that Philip Landry was at fault and that Fayard was comparatively at fault for failing to cross at a nearby controlled intersection, noting that he was familiar with the area.
On appeal, DOTD asserts that the trial judge erred in finding it 20% at fault because, 1) plaintiffs failed to show by a preponderance of the evidence that the street lighting was inadequate; 2) plaintiffs failed to show that the lighting was a cause in fact of Fayard’s injuries; 3) the trial judge misapplied the duty-risk standard in finding that DOTD owed plaintiffs a duty; 4) the Fa-yard’s own actions caused his injuries; 5) the evidence showed that DOTD has no ^responsibility for street lighting at the scene of the accident and; 5B) and 5C) the trial judge erred in excluding portions of the testimony of Robert Roth concerning the party who had responsibility for the design, installation and maintenance of the roadway lighting at the accident scene and in excluding LP & L records reflecting ownership, installation and payment for street light services at the scene of the accident. The sixth assignment of error asserts that the trial judge erred in denying its Motion for Involuntary Dismissal at the conclusion of plaintiffs case. Seventh, it contends that the trial judge abused his discretion in awarding Fa-yard $250,000 in damages. Last, DOTD contends that the trial judge erred in awarding Fayard the $8,000 attributable to the intervention as costs of trial.
Fayard filed an answer to the appeal, asserting that the trial judge erred in finding him 50% at fault and that DOTD’s percentage of fault should be increased. Fayard further contends that the trial judge erred by awarding inadequate damages.
FAULT OF DOTD
The trial judge concluded that DOTD was responsible for the lighting at the scene of the accident, that the lighting was inadequate and that the poor lighting was a cause of the accident. Both plaintiffs and defendants called expert witnesses in this regard and the trial judge’s findings would be subject to manifest error review by this court. However, our review of the Revised Statutes indicates that, as a general rule, the DOTD does not have responsibility for street lighting along state roads that go through municipalities. La.R.S. 48:193 A states in part:
193. Highways through municipalities
hA- The board of highways is hereby directed to repair and to keep in operating condition at its sole cost and expense, all municipal roads or streets which form a continuation of one of said highways, provided however, the final decision as to the designation or location of the particular municipal road or streets to be placed in the state system shall be left entirely up to the board of highways. At the request of the governing authority of a municipality the work may be contracted out to such municipality, but all such maintenance costs shall be paid for by the state, provided that the state shall not be responsible for the maintenance of sewers, street lighting, gas and water mains and other public *1373 utilities. All damages to the streets or highways occasioned by the laying of sewers, street lighting and other public utilities shall be paid by the owner thereof. The board of highways shall control the parking on any highway which is hereafter constructed, widened or relocated at the sole expense of the state. The board of highways shall control signal lights and traffic other than parking on highways in the state system established hereby. (Emphasis added)
Thus, in the absence of a contract, DOTD has no duty to maintain street lighting in a municipality. And, in this case, no evidence was introduced showing either a written or verbal contract with the Parish or that the DOTD took upon itself the obligation to maintain the lights along Jefferson Highway. Nor was any evidence produced by plaintiffs to show that DOTD either in-fact installed the original lighting or that it had a legal obligation to provide or install such lighting. DOTD admitted, and the testimony showed, that the state is responsible for the lighting on the north-south J-Hook overpass at the intersection of Causeway Boulevard and Jefferson Highway and that the state and the Parish had been studying ways to correct problems causing accidents since 1978 in the Hook or at the intersection. Those studies analyzed the approaches from east-west, but no specific studies were conducted relative to the street lighting on the highway.
Plaintiff has the burden to prove by a preponderance of the evidence all the elements of his ease. Plaintiff, however, produced no evidence that DOTD had ever been responsible for the lighting on Jefferson Highway. DOTD, on the pother hand, produced the testimony of Robert Roth, DOTD district maintenance engineer for District 2, which includes Jefferson Parish and Charles Meyer, DOTD electrical design engineer, both of whom testified that DOTD was not and never had been responsible for street lighting on Jefferson Highway. Because plaintiffs failed to produce any evidence that DOTD was responsible for the street lighting on Jefferson Highway at the location of the accident, we must find that the trial judge erred in finding DOTD liable due to the poor lighting. The question then remains as to whether plaintiffs produced evidence that some other defect of the roadway for which DOTD is responsible was a cause of the accident.
Plaintiffs’ expert put forth two other theories of DOTD’s fault. The first was that the lighting on the J-Hook was defective and, had it been working properly, would have produced sufficient light to combat the poor lighting on Jefferson Highway. However, the lighting on the J-Hook overpass was designed to light the J-Hook roadway, not Jefferson Highway. Thus, DOTD’s actions or inaction relative to the lighting on that structure is irrelevant in this case.
The second area of concern was whether there existed a safe place for pedestrians to cross Jefferson Highway. In this regard, the witnesses all testified that a traffic light and crosswalk were located approximately 400 feet from where the accident occurred. Fayard testified that it was quicker and easier to cross the street by the McDonald’s, rather than walking to the nearest traffic controlled intersection at Jefferson Highway and Maine Street. The eyewitness, Tuan Mina Le, Marcia Fayard and Roy Fa-yard’s sister, Monalisa Simper, testified that most pedestrians in that area crossed the street in front of McDonald’s. They crossed there because it was difficult, if not dangerous, to try to cross at the traffic signal |8at Jefferson Highway and Maine. They stated that the signal light did not have a pedestrian “walk-no walk” signal. Although the signal light produced gaps in the east-west traffic, when red, there was heavy turning traffic. As a result, the gap time between east-west signal changes did not allow pedestrians to cross easily or safely. Those statements were supported by plaintiffs’ expert traffic engineer, Ismael Garza.
Mr. Garza visited the site on seven or eight occasions, including at nighttime. He considered the area of the accident to be hostile to pedestrians because of the lighting and also because there was no safe place to cross the highway. He agreed that the traffic signal at Maine was not safe, adding that the short duration between light changes did not allow *1374 time to cross the highway. He noted that a pedestrian needs ten seconds to cross three lanes of traffic (to get to the median) and that the gaps in the Maine Street traffic signals were four seconds. Mr. Garza stated that the installation of a signal light under the Causeway J-Hook overpass to stop east-west bound traffic would provide a safer environment for pedestrians to cross. The testimony showed that the overpass is within 78 to 100 feet of the accident site and Mr. Garza stated that merging traffic from the J-Hook creates a distraction for east bound drivers. He noted that there is a quite a bit of pedestrian traffic in the evenings and a bus stop is located on both sides of the highway under the overpass, with no nearby pedestrian controlled intersection to protect pedestrians crossing the roadway. Although he admitted on cross-examination that the number of pedestrians crossing an area is a factor to be considered in deciding whether to install a pedestrian synchronized signal, he also stated that other factors, such as traffic flow, gaps in the traffic stream and the distance the pedestrians have to walk tojjget to a safe crossing must be considered. On redirect examination, Mr. Garza stated that the area of 100-200 feet on either side of Causeway was part of the studies undertaken by the state and parish to correct the accident problem at Causeway and Jefferson Highway. He also contended that the same problems confronting the pedestrians at Causeway would affect the pedestrians crossing in front of McDonald’s. He concluded that even though conditions may have been appropriate at some time in the past, when those conditions become unsafe, the problems need to be corrected. As a result, he believed that the area around the J-Hook overpass is one of the most, if not the most, hazardous area of Jefferson Highway for pedestrians and drivers.
DOTD produced opposing testimony. Jeff Milburn, DOTD’s traffic engineer, viewed the site on two daytime occasions. He testified that the gap times were sufficient at the Maine Street intersection to allow safe crossing. He stated that it was not easy because of the right turn on red traffic, but it was not impossible. He stated that in off-peak times it is not impossible to cross. He noted that it was not a safe practice to cross the roadway in the middle of the block and that the law prohibits crossing in the middle of a block. He noted that pedestrians crossing at the Maine Street intersection could take refuge on the median between light changes. He further stated that 400 feet from the McDonald’s to the traffic light at Maine was a reasonable distance to walk to cross the highway.
DOTD has a duty to regulate the highways and to insure that they are safe for all persons who might otherwise be harmed. Forest v. State, Department of Transportation and Development, 493 So.2d 563 (La.1986). However, it is not llt)a guarantor of the safety of travelers. Alford v. Estate of Zanca, 552 So.2d 7 (La.App. 5th Cir.1989).
In this case, the evidence showed that the DOTD and the parish’s studies indicated that the area around the accident site was hazardous to pedestrians and drivers. DOTD is responsible for the traffic signals on its highways and the safety of travelers on those highways. Although there was a crosswalk and traffic signal at the Maine Street intersection, the preponderance of the evidence showed that said intersection was no safer to cross than the unprotected area in the middle of the block in front of McDonald’s. Furthermore, the evidence showed that pedestrian traffic had established a crossing pattern in front of McDonald’s, as well as under the Causeway J-Hook overpass. As conditions in the area changed, it was incumbent on the DOTD to take steps to make the area safe, even though it may have been safe in the past. Thus, although DOTD bears no responsibility for the poor lighting on the roadway, it is liable for failing to maintain a safe roadway for drivers and pedestrians. Thus, we find that the trial judge did not err in finding that the DOTD breach of duty to Fayard was one of the causes of the accident. Because of this finding, we also conclude that the trial judge did not err in refusing to grant DOTD’s Motion for Involuntary Dismissal urged at the end of plaintiffs’ ease.
PERCENTAGES OF FAULT:
 Both DOTD and plaintiffs complain that the trial judge erred in the apportion *1375 ment of fault. Our review of the trial judge’s factual findings in this matter are subject to a determination of manifest error. Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993).
| nThe trial judge determined DOTD to be 20% at fault, but based his findings on the poor lighting. Although we concluded that DOTD is liable for different reasons, we find that the percentage of fault assigned to DOTD, plaintiff and the driver of the automobile is not manifestly erroneous. Fayard knew the area and knew it to be a high traffic area. It is illegal to cross the street in the middle of a block and the law prohibiting such acts is designed to prevent the type of accident that occurred here. However, Landry bears responsibility as well, for failing to see what he should have seen. Furthermore, DOTD bears responsibility because it is charged with the duty to maintain the state roadways in a safe condition, which it failed to do in this case by ignoring pedestrian needs which had developed in a heavy traffic area. Based on the facts, we conclude that the trial judge was not manifestly erroneous in his apportionment of fault.
DAMAGES:
Both DOTD and Fayard appeal the award of damages to Fayard.[1] DOTD asserts that the trial judge abused his discretion in awarding excessive damages and plaintiff contends that the trial judge abused his discretion in awarding inadequate damages.
The record reveals that Fayard was an active 15 year old when the accident occurred. He played basketball and was on the football team at school. Fayard enjoyed bicycle racing and other activities suitable to his age. His personality was outgoing. However, he dropped out of school in the 10th grade, but was working on his G.E.D. at the time of trial.
Fayard suffered severe injuries to his knees, particularly his left knee. He underwent five reconstructive surgeries to his left knee that resulted in a 20% | ^disability to the left leg, as testified to by his treating physician, Dr. Michael Brunet. Immediately following the accident he spent one and one-half months in the hospital. He underwent a long and difficult rehabilitation process. It was over one and a half years before he was out of a wheelchair and could walk with a limp. Further, he can no longer stand for any normal length of time. Dr. Brunet testified that he is more likely to suffer arthritis in the future as a result of the trauma. Fayard testified that he still has pain in his leg.[2]
Since the accident, the witnesses testified that he had become reclusive and depressed because he is having difficulty coming to terms with his disability. He is now engaged to be married and met his fiancee at the pool of the apartment complex which his mother manages.
Dr. Brunet testified that Fayard’s disability will prevent him from participating in some types of occupations. He cannot perform heavy manual labor or work around heavy equipment on a regular basis. He cannot work on uneven surfaces or from heights because he cannot maneuver well enough to prevent falls or to avoid objects.
Dr. Craig Feldbaum, Fayard’s expert psychologist and rehabilitation counselor, testified that given his low average I.Q., Fayard’s best job market before the accident was doing manual labor. Dr. Feldbaum met with Fayard on a number of occasions and gave him a battery of tests. He reviewed available opportunities in the job market. He concluded that jobs for which Fayard was physically fit and mentally capable would pay a starting wage of $4.75, with an increase to $7.00 in three years. Absent his disability, he testified that Fayard Lgcould have expected to earn up to $12.00 an hour in the same period. Dr. Melvin Wolfson, Fayard’s economist testified that the present value of future lost wages from date of trial was $445,908, without considering 12% in fringe benefits. He calculated that Fayard lost $45,760 in *1376 wages prior to trial, for a total of $491,668 in past and future lost wages.
Fayard incurred approximately $25,000 in medical expenses. He contends thus, that without considering pain and suffering, his future lost wages and medical expenses total $575,000. He contends that, with pain and suffering, loss of enjoyment of life, psychological and physical disabilities, the lowest reasonable amount the trial judge could have awarded is $750,000.
DOTD’s vocational rehabilitation expert, Jeffrey Carlisle, testified that he found several jobs available in the Baton Rouge area, where Fayard now resides, that he could perform with significantly higher entry level salaries. However, Dr. Feldbaum was called on rebuttal and testified that he spoke to those employers and found out that with one exception, either Fayard was not qualified or the job was no longer available.
Economist, Kenneth Boudreaux, testified for DOTD. He based his conclusions on Dr. Carlisle’s report, which showed that Fayard is interested in electronics. He concluded that there would not be any lost future wages beyond 36 months. He calculated that Fa-yard could attend electronics school for 18 months, which would bring him an entry level wage of $6.00 per hour, but ending with $10.00 an hour after another 18 months. He figured that Fayard would have started with $8.00 an hour before the accident. Dr. Bou-dreaux offset that school time with $10.00 per hour lost wages, concluding that Fayard would be entitled to $30,638 in lost wages.
Ii/The trial judge did not itemize his award to Fayard, so we cannot determine what amounts the trial judge awarded for wage losses. However, the record reflects that Fayard can be educated and trained to perform gainful employment. While the figures vary widely by the experts, with education, he can probably enter the workforce at or above his pre-accident rate. We cannot determine what the trial judge awarded for general damages, either. However, after reviewing the evidence, we find that the award by the trial judge in relation to these items of damages was not so low as to constitute an abuse of discretion.
AWARD OF AMOUNT OF INTERVENTION AS COSTS:
After a hearing on the Motion to Fix Costs, the trial judge awarded the costs of the Charity Hospital intervention as costs against DOTD. DOTD asserts that the trial judge erred in awarding the $8,787.99 as costs, contending that it is a duplicative recovery. Fayard asserts that the award is not duplicative, as evidenced by the transcript of the hearing.
The transcript reflects that the trial judge failed to consider the amount of the intervention in his award. He decided to treat the amount as costs, which are paid by DOTD. The trial judge has discretion in the awarding of costs. La.C.C.P. art. 1920. However, the amount of the intervention is not properly allocated as costs. That amount should have been included as a part of the damage award. Clearly, the trial judge intended to do so. Thus, Fayard is entitled to a total damage award in the amount of $258,787.99. We will amend the judgment to reflect the DOTD’s percentage of fault and the proportionate share owed by DOTD to Fayard. We will further amend the judgment for costs to delete the amount of the Charity Hospital intervention.
| xsAccordingly, the judgment dated December 16, 1993 is hereby amended to award Fayard $51,757.60 representing the 20% fault allocated to DOTD with legal interest and all costs of this proceeding. Said judgment is affirmed in all other respects.
Further, the judgment dated March 15, 1994 is hereby amended to award the Fa-yards $5,049.00, representing the costs itemized in the judgment, less the $8,787.99 for the Charity Hospital intervention, plus legal interest from date of judgment until paid. Said judgment is affirmed in all other respects.
Costs of this appeal are to be paid by DOTD.

AFFIRMED AS AMENDED.

. The award to Mrs. Fayard was not appealed.

. Mrs. Fayard was awarded $18,000 to compensate for the wages she lost when she had to stop working outside of the home in order to care for her son during his surgeries and recuperation.